KODIAK ISLAND BOROUGH,
Appellant/Cross–Appellee,

v.

Joan ROE, on behalf of her ward,
Appellee/Cross–Appellant.

Nos. S–10058, S–10137.

Supreme Court of Alaska.

Feb. 7, 2003.

James D. Gilmore and Kristina Sue Mason, Gilmore & Doherty, Anchorage, for Appellant/Cross–Appellee.

Kirsten Tinglum, Donna J. McCready, and William S. Cummings, Ashburn & Mason, P.C., for Appellee/Cross–Appellant.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

A civil jury found two Kodiak Island Borough employees liable for intentional torts they committed against a resident at a borough-operated facility for developmentally disabled women. The jury also found the borough negligent for failing to prevent the employees' intentional torts. The trial court declined to permit the jury to allocate fault and apportion damages between the negligent and intentional tortfeasors, interpreting the apportionment statutes then in effect to preclude such an allocation. Because the applicable apportionment statutes were silent on the issue of allocating fault in this situation, and because the common law disallowed such an apportionment, we affirm the trial court's decision precluding apportionment.

Because we find no reversible error on the other issues the borough appeals, we affirm the judgment.

## II. FACTS AND PROCEEDINGS

C.E. is a developmentally disabled woman who suffers from cerebral palsy.[1] C.E. functions intellectually and socially at the level of a ten- to twelve-year-old child with an IQ in the lower-sixties. In 1990 she moved into a semi-independent apartment which was part of a Kodiak Island Borough residential treatment program.[2] C.E.'s apartment was next door to the residential program's Crisis Respite Unit. The Crisis Respite Unit staff had keys to the semi-independent apartments and administered medication to the women who lived there.

Jacob Simeonoff and Dana McNair were borough residential program employees in 1990. Simeonoff was hired after twice residing in the residential program for mental health and substance abuse problems, and after having been convicted twenty-eight times of criminal offenses, including felony assault. He was hired in 1988 as a Crisis Respite Unit staff member, even though the director of the residential program knew at the time of Simeonoff's history. Previously employed through associated programs in the 1980's, McNair was hired in 1991 as a skills trainer in charge of securing the residential program residents' safety, health, and welfare, and periodically filled in for Crisis Respite Unit staff.

C.E. became pregnant in 1991 and gave birth to M.E. In 1995, under pressure from the Alaska Child Support Enforcement Division to establish the paternity of her child, C.E. revealed that she had had intercourse with Simeonoff and McNair. DNA testing determined that Simeonoff was M.E.'s father.

Joan Roe, C.E.'s mother, filed a lawsuit against Simeonoff, McNair, and the borough alleging among other things that the borough negligently hired, retained, promoted, and supervised Simeonoff and McNair.[3] Trial was held in late 2000. The trial jury found that the borough was negligent in hiring, retaining, promoting, or supervising Simeonoff and McNair, and that the negligence was a substantial factor in causing harm to C.E. It found that Simeonoff and McNair intentionally touched C.E. four times and that the touching was a substantial factor in causing harm to C.E. The jury found that C.E. suffered $350,000 in economic damages and $1 million in non-economic damages. The trial court then entered judgment in the principal amount of $1,350,000 against the borough.

The borough appeals, raising various issues.[4]

## III. DISCUSSION

### A. The Trial Court Properly Declined To Allow the Jury To Allocate Fault and Apportion Damages Between the Negligent and Intentional Tortfeasors.

 The borough argues that it was error to prevent the jury from apportioning fault between intentional and negligent tortfeasors. The question whether fault could be allocated and damages apportioned between negligent and intentional tortfeasors turns on

---

1. Although this appeal turns on legal issues, on appeal we take all permissible factual inferences in favor of the appellee, the party who prevailed at trial.

2. The borough provided various services including housing, mental health, and assisted-living services, and taught basic living and social interaction skills to developmentally disabled and mentally ill residents under the umbrella of its residential treatment programs. The parties are not consistent in referring to this "RTP" as the borough's "Residential Treatment Program" or "Residential Training Program." Our analysis does not turn on this distinction, and we refer to it throughout as the borough's "residential program."

3. Joan Roe, the named plaintiff, is C.E.'s mother. Two suits were originally filed on C.E.'s behalf. Those cases were consolidated and Roe was substituted as C.E.'s legal guardian. Roe's initial complaint alleged individual emotional distress claims that were later dismissed. These were the only claims Roe brought in her individual capacity, and she was accordingly dismissed as an individual plaintiff.

4. Roe initially commenced a cross-appeal but "abandoned all points on cross-appeal" in a notification filed after she submitted her brief on January 10, 2002. We accordingly dismissed the cross-appeal.

the interpretation of former AS 09.17.080 (1989) and former AS 09.17.900 (1986) and the common law of torts as it existed in Alaska in 1991, when these torts were committed.[5] We discern no error.[6]

Roe filed a motion to establish the law of the case, arguing that the borough had a special protective relationship with C.E., and that it negligently failed to prevent a foreseeable harm which it had a duty to prevent. Roe further argued that under Alaska Statutes then in effect, and under the RESTATEMENT (SECOND) OF TORTS § 315, the borough should not be able to "escape" liability by shifting liability to an intentional third party tortfeasor.[7]

The superior court granted Roe's motion. It considered AS 09.17.080 and .900 and the history of tort reform in Alaska, and determined that while not currently the law in Alaska, apportionment between negligent and intentional tortfeasors was not permitted prior to 1997, when the legislature specifically redefined "fault" for purposes of the apportionment statute to provide for such allocations. The superior court relied on policy arguments against apportionment discussed by the Tennessee Supreme Court in *Turner v. Jordan*,[8] and on our decision in *Borg–Warner Corp. v. Avco Corp.*,[9] in which we stated that section .900 clearly contemplated apportionment between all unintentional tortfeasors.

On appeal the borough advances statutory and policy arguments, and points to the his-

---

**5.** Former AS 09.17.080 (1989) stated:

> **Apportionment of damages.** (a) In all actions involving fault of more than one party to the action, including third-party defendants and persons who have been released under AS 09.16.040, the court, unless otherwise agreed by all parties, shall instruct the jury to answer special interrogatories or, if there is no jury, shall make findings, indicating
> (1) the amount of damages each claimant would be entitled to recover if contributory fault is disregarded; and
> (2) the percentage of the total fault of all of the parties to each claim that is allocated to each claimant, defendant, third-party defendant, and person who has been released from liability under AS 09.16.040.
> (b) In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault, and the extent of the causal relation between the conduct and the damages claimed. The trier of fact may determine that two or more persons are to be treated as a single party if their conduct was a cause of the damages claimed and the separate act or omission of each person cannot be distinguished.
> (c) The court shall determine the award of damages to each claimant in accordance with the findings, subject to a reduction under AS 09.16.040, and enter judgment against each party liable. The court also shall determine and state in the judgment each party's equitable share of the obligation to each claimant in accordance with the respective percentages of fault.
> (d) The court shall enter judgment against each party liable on the basis of several liability in accordance with that party's percentage of fault.
> Former AS 09.17.900 (1986) stated:
> **Definition.** In this chapter "fault" includes acts or omissions that are in any measure negligent or reckless toward the person or property of the actor or others, or that subject a person to strict tort liability. The term also includes breach of warranty, unreasonable assumption of risk not constituting an enforceable express consent, misuse of a product for which the defendant otherwise would be liable, and unreasonable failure to avoid an injury or to mitigate damages. Legal requirements of causal relation apply both to fault as the basis for liability and to contributory fault.

**6.** We review de novo questions of law, including a trial court's interpretation of a statute, adopting the rule of law most persuasive in light of precedent, reason, and policy. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

**7.** RESTATEMENT (SECOND) OF TORTS § 315 (1965) states:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.
> Roe cites *Division of Corrections v. Neakok*, 721 P.2d 1121, 1126 (Alaska 1986), for the proposition that § 315 reflects the law in Alaska.

**8.** 957 S.W.2d 815, 823 (Tenn.1997) (citing potential for perverse incentive effects apportioning damages in analogous situation, and difficulty of comparing relative culpability when intentional conduct is foreseeable risk created by negligent actor).

**9.** 850 P.2d 628, 633 (Alaska 1993).

tory of joint liability in Alaska to support its claim that the trial court erred by preventing the jury from apportioning damages between the borough and the two intentional tortfeasors, Simeonoff and McNair. The borough agrees with the trial court that whether allocation was appropriate turns on the interpretation of AS 09.17.080 and .900, but reads the history of joint liability in Alaska and voter intent to favor apportionment.

In characterizing Alaska's experience with tort reform, the borough observes that at common law, and in Alaska before 1970, joint tortfeasors were jointly and severally liable and did not have a right of contribution against each other.[10] The legislature granted joint tortfeasors the right of contribution in 1970 by enacting the Alaska Uniform Contribution Among Tortfeasors Act.[11] That act explicitly precluded intentional tortfeasors from seeking contribution.[12] Tort reform legislation in 1986 amended the contribution act, and required that the liability of joint tortfeasors be determined by each tortfeasor's percentage of fault.[13] In that year the legislature also enacted AS 09.17.900, which defined "fault" to include negligent or reckless acts or omissions, but which did not mention intentional acts.[14] In 1988 Alaska voters passed Ballot Measure No. 2, thereby replacing joint and several liability with pure several liability. But Ballot Measure No. 2 did not modify the definition of "fault" contained in section .900. In 1997 the legislature amended the definition of "fault" in section .900 to explicitly include intentional acts.[15]

The borough argues that the 1997 amendment which added a specific reference to "intentional" acts in section .900's definition of fault was a clarification of existing law, and that the definition encompassed intentional acts even before the amendment. The borough suggests that section .900 has al-

ways been inclusory, even though it did not contain the word "intentional" until 1997, and that the passage of Ballot Measure No. 2 in 1988 demonstrated that the voters clearly intended to hold each tortfeasor responsible for only that tortfeasor's percentage of fault, regardless of whether the tortfeasor's act was negligent, reckless, or intentional. It argues that assigning an intentional tortfeasor's liability to a negligent actor would defeat voter intentions. It also asserts that allowing the allocation it sought would not have reduced the incentive to engage in non-negligent conduct, because, it reasons, the prospect of being held liable for their own negligence would encourage actors to use reasonable care to prevent their employees from committing intentional torts.

Roe responds by referring to the "plain meaning" of the statute and discussing established principles of statutory interpretation. She argues that because the definition in section .900 before 1997 did not explicitly include intentional conduct, the liability allocation excluded intentional conduct. She relies on our holding in *Borg–Warner*, observes that Ballot Measure No. 2 did not change section .900, and argues that until 1997, only unintentional tortfeasors were parties at "fault" for allocation purposes. She also concludes that Ballot Measure No. 2 only changed how damages would be allocated—from joint and several liability to pure several liability—not between whom they would be allocated.

Roe also contends that the borough had a duty to prevent foreseeable harm to C.E. under agency principles and nondelegable duty theory; the borough responds that these arguments were unsupported, dropped in Roe's abandoned cross-appeal, and waived because she failed to raise them below. We do not need to consider whether Roe pre-

---

**10.** *See Arctic Structures, Inc. v. Wedmore,* 605 P.2d 426, 430–33 (Alaska 1979).

**11.** Ch. 80, § 1, SLA 1970 (codified as amended at AS 09.16.010–.060).

**12.** Former AS 09.16.010(c) (1985).

**13.** Former AS 09.17.080 (1986).

**14.** Ch. 139, § 1, SLA 1986. *See supra* note 5 for text of AS 09.17.900 (1986).

**15.** AS 09.17.900 (1997) provides in pertinent part: "In this chapter, 'fault' includes acts or omissions that are in any measure negligent, reckless, or intentional toward the person or property of the actor or others, or that subject a person to strict tort liability."

served these arguments, because the issue presented here turns on the language of the statutes, the history of tort reform, and the state of the common law as of 1991, when Roe's cause of action arose.

We think Roe and the trial court correctly interpreted the apportionment statutes as they read before the legislature enacted the 1997 amendment. Before 1997 the statutes were silent on the issue of apportioning intentional conduct, and even though the Governor's Advisory Task Force on Civil Justice Reform labeled its proposed redefinition of section .900 a "clarification," we think the amendment altered the status quo.[16] Because the apportionment statutes did not apply to intentional conduct before 1997, the common law governs this dispute.[17]

The common law as it existed in many jurisdictions, and as it existed in Alaska before 1997, is accurately described by the RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIABILITY § 14, which states:

A person who is liable to another based on a failure to protect the other from the specific risk of an intentional tort is jointly and severally liable for the share of comparative responsibility assigned to the intentional tortfeasor in addition to the share of comparative responsibility assigned to the person.[18]

Although this RESTATEMENT section was published in 2000, it accurately describes the status of the common law on this topic as it stood for years before publication.[19] It also specifically addresses the topic of allocating fault between negligent tortfeasors and intentional tortfeasors when the negligent act consists of failing to protect against a specific risk of an intentional tort in jurisdictions, like Alaska, that recognized principles of comparative responsibility. The RESTATEMENT section accurately portrays the common law as it was in Alaska before 1997, when the legislature amended section .900 and changed the law.

The borough failed here to protect C.E. from the foreseeable risk that Simeonoff and McNair would sexually abuse her. Both par-

---

16. The Governor's Advisory Task Force on Civil Justice Reform recommended in 1996 amending the definition of "fault" contained in section .900. The task force's report to the governor entitled the proposed modification to section .900, "Clarification Of Liability For Intentional Acts." The accompanying commentary similarly implied that the proposed amendment would "clarify" section .900's applicability to intentional torts. The proposed amendment was presented to the legislature as the task force recommended, and the Sponsor Statement introducing the bill reiterated the task force's suggestion that the amended definition would "clarify" section .900. *See* Report of the Governor's Advisory Task Force on Civil Justice Reform, at 51 (1996); Sponsor Statement of SSHB 58(JUD): Tort Reform Bill.

Despite these characterizations of the amendment as a "clarification," we conclude that amending the definition to include intentional conduct substantively altered the status quo. The legislative history was equivocal. The same documents the borough relies on also state that the task force was charged with suggesting a series of "Civil Justice Reforms," not "clarifications." Similarly, the amended redefinition was introduced as part of a 1997 "Tort Reform Bill." Moreover, the Sponsor Statement introducing the bill spoke of "a compelling need for substantial reforms in the civil justice system." The legislative history does not justify a conclusion that the amendment merely confirmed that the definition encompassed intentional conduct. We

assume that words added to a statute are not mere surplusage. *Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 761 (Alaska 1999) ("We must also presume that the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect, and that no words or provisions are superfluous. Furthermore, we generally presume that an amendment to an unambiguous statute indicates a substantive change in the law.") (internal quotation marks and footnote omitted).

17. *See Alaska Fed'n for Cmty. Self–Reliance v. Alaska Pub. Util. Comm'n*, 879 P.2d 1015, 1022 (Alaska 1994) (applying common law where statute was silent on number of votes necessary for body to take action); *Alex v. State*, 484 P.2d 677, 678 (Alaska 1971) (looking to common law to define "escape" absent definition in escape statute); *Herrin v. State*, 449 P.2d 674, 676 (Alaska 1969) (imputing common law intent where statute was silent on intent requirement).

18. RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIABILITY § 14 (2000).

19. The Reporter's Note to Comment b of section 14 makes it clear that the logic of this section is grounded on pre–1997 precedent, and is consistent with decisions of jurisdictions which had abolished joint and several liability. *See* RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIABILITY § 14 cmt. b (2000).

ties' experts agreed that the duty to protect the residents of this program lay with the caretaker. The residential program directors knew that staff abuse of developmentally disabled residential clients was a risk. They knew of Simeonoff's and McNair's backgrounds and yet gave them unobstructed access, through their jobs, to particularly vulnerable potential victims. The borough can be held responsible for the consequences of the intentional torts of its employees in this case because the jury found that it negligently failed to protect C.E. from the specific risk of Simeonoff's and McNair's intentional torts.

We recognize that the 1997 amendment displaced the common law and that section .900 may now permit an apportionment that is contrary to RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIABILITY § 14.[20] But before 1997 the common law on this issue governed. The trial court accordingly did not err in refusing to permit the jury to apportion fault between the borough and the intentional tortfeasors.

### B. The Trial Court Properly Instructed the Jury as to Intentional Conduct Without Issuing an Instruction on Negligence or Recklessness.

■ By the time her case went to the jury, Roe had dropped her negligence and recklessness claims against Simeonoff and McNair, and was alleging only intentional torts as to them. Nevertheless, the borough proposed a special verdict form question that would have asked the jury whether either Simeonoff or McNair was negligent or reckless. The borough argued that AS 09.17.080 required trial courts in actions involving multiple tortfeasors to instruct the jury on negligence and recklessness. The trial court rejected the borough's proposals and did not instruct the jury to consider whether Simeonoff or McNair had been negligent or reckless. The borough argues on appeal that this denied it the opportunity to have the jury allocate fault to Simeonoff and McNair.

■ We review jury instructions[21] and special verdict forms[22] de novo. We will reverse for instructional error only if a party suffered prejudice.[23] We review de novo whether a party suffered prejudice.[24]

We agree with Roe that the issue was immaterial. Had the jury found Simeonoff or McNair liable for anything less than an intentional touching, they would not have been liable for assault, the only tort claim against them Roe took to the jury.[25] There was no reason for the jury to consider claims Roe was no longer pursuing. The borough was not prejudiced by the trial court's ruling on this issue because there would have been no fault to allocate and damages to apportion had the jury not found that Simeonoff and McNair acted with intent.

### C. The Trial Court Properly Ruled that Each Incident of Sexual Contact Permitted a Separate Claim for Emotional Distress.

■ Roe moved before trial for a declaration of law that each sexual assault against C.E. was a separate incident for purposes of the AS 09.17.010 damages cap.[26] The borough opposed the motion, arguing that it was premature because the record did not suffi-

---

20. We are not ruling on how this case would be decided under current law, as that question is not before us.

21. *Griffith v. Taylor*, 12 P.3d 1163, 1166 (Alaska 2000).

22. *Stinson v. Holder*, 996 P.2d 1238, 1244 (Alaska 2000).

23. *Id.*

24. *Id.*

25. *See Taylor v. Johnston*, 985 P.2d 460, 464 (Alaska 1999) (defining "assault" to require find-

ing of intent to cause harmful or offensive contact).

26. Former AS 09.17.010 (1986) provided in part:
 (a) In an action to recover damages for personal injury based on negligence, damages for noneconomic losses shall be limited to compensation for pain, suffering, inconvenience, physical impairment, disfigurement, loss of enjoyment of life and other nonpecuniary damage.
 (b) The amount of damages awarded by a court or a jury under (a) of this section may not exceed $500,000 for each claim based on a separate incident or injury.

ciently establish how many incidents there had been, and because Roe did not plead a separate tort claim for each alleged assault. The trial court ruled that the legislature intended to allow damage awards for multiple incidents of assault, and interpreted the statute to allow an award for each sexual assault. The court instructed the jury that it could assess damages for each instance of Simeonoff's or McNair's sexual contact.

The borough now argues that the court's legal ruling and the corresponding jury instruction based on that ruling were erroneous. It argues that the instruction was erroneous because it was predicated on claims that Roe had abandoned before the case went to the jury. The borough asserts that the word "claim" in the statute should be understood to mean the "legal basis for recovery," and that damages should have been limited to the "claim" against the borough that went to the jury—that the borough negligently hired, retained, promoted, or supervised Simeonoff and McNair.

Roe asserts that this court should affirm the trial court's ruling and jury instruction because the plain language of the statute applied the cap to each incident of assault.

We agree that each event was a separate incident for purposes of calculating damages. We agree with the trial court that the plain language of the statute is clear. The statute limited damages awards "for each claim based on a separate incident or injury." [27] Absent any legislative history to the contrary, the plain language of the statute compels us to conclude that the legislature intended to allow multiple claims of injury based on multiple incidents. [28] The jury found four incidents of assault and permissibly decided that each separate incident caused a separate injury. The trial court did not err in allowing the jury to consider whether to award damages for each assault.

### D. Instructing the Jury on the Non-economic Damages Cap Was Harmless Error.

The trial court instructed the jury that, under AS 09.17.010, [29] it could not award more than $500,000 in non-economic damages for each instance in which Simeonoff or McNair "intentionally touched [C.E.] in a harmful or disagreeable way." The court reasoned that "it's the jury that does the awarding" of damages and that it would be deceptive not to tell the jury of the limit on the amount the plaintiff could be awarded.

The borough challenges the instruction on statutory grounds and also claims that the erroneous instruction rendered the cap unconstitutional. First, it argues that although the statute in effect when this cause of action accrued was silent on whether trial courts should instruct on the cap, [30] the statutory term "awarded" indicated that the cap should have been applied after the jury reached its verdict, not by the jury during deliberations. Second, the borough asserts that the instruction denied it the right to a jury trial by removing the issue of damages from the factfinder. The borough claims that it was prejudiced because revealing the cap to the jury produced an "anchoring" effect which limited the jury's ability to independently assess C.E.'s damages.

Roe responds that the instruction was not explicitly prohibited, that the jury did decide the issue of damages, and that the instruction did not prejudice the borough. She points out that the award was ultimately lower than the amount C.E. requested and which the cap allowed.

■■■ We agree with the borough that it was error to instruct on the damages cap. The legislature may limit the amount of damages that can be awarded, but it is for the jury to determine the extent of the plaintiff's

---

27. Former AS 09.17.010(b) (1986).

28. Courts in other jurisdictions similarly refuse to treat separate recoveries for separate incidents of sexual misconduct as a single claim of damages under statutory damage caps limiting recovery for each "claim." *See, e.g., Maguire v. Montana*, 254 Mont. 178, 835 P.2d 755, 762 (1992) (holding each incident of rape was separate

wrongful act giving rise to separate "claim" under statutory cap limiting damages for "each claim" against governmental entity).

29. Former AS 09.17.010 (1986).

30. *Id.*

injury and the damage award that will make her whole. Instructing the jury on the cap interferes with these responsibilities. We recently ruled in *Central Bering Sea Fishermen's Association v. Anderson* that instructing a jury on punitive damages caps "carried a substantial risk of suggesting the range of appropriate punitive awards."[31] That observation also applies to caps relating to compensatory damages.

■ Nevertheless, we conclude here as we did in *Central Bering Sea* that the error does not warrant reversal.[32] First, as in *Central Bering Sea*, the trial court's ruling was a matter of first impression and there was no clear guidance available on the issue. The jury's verdict in this case preceded publication of *Central Bering Sea* by nearly two years. Second, Roe did not exploit the error by arguing that the cap should guide the jury in considering appropriate awards. Third, the jury permissibly found four separate incidents of assault, which meant that more than one cap applied.[33] And fourth, the jury's non-economic award of $1,000,000 was half the total amount allowable under the caps. This makes it unlikely that the erroneous cap instruction affected the damage award.

### E. The Trial Court Did Not Err in Permitting a Special Damage Award for the Extraordinary Costs of Raising M.E.

■ Roe moved before trial to establish the law of the case to allow her to argue for special damages in conjunction with raising M.E., the child of C.E. The superior court allowed Roe to argue for these extraordinary expenses, and the jury found $350,000 in economic damages.

The borough argues on appeal that the trial court erred in allowing these special damages because the "extraordinary" costs a developmentally disabled woman would incur in raising a healthy child were not the product of the borough's negligence. The borough argues that C.E.'s parental economic

responsibilities were caused by deliberate choices made by C.E., Roe, and C.E.'s former guardian—not by the borough's negligence. It asserts that it should not have to pay child-rearing expenses beyond conventional tort damages, which it argues should be tailored to compensate the tort victim for injuries resulting from the tortious conduct. The borough argues that this situation is governed by *Poor v. Moore*[34] and *M.A. v. United States*,[35] which explicitly precluded recovery of damages for child-raising expenses. It further argues that the borough's taxpayers should not have to bear the costs which parents must bear. The borough contends that to hold otherwise would inspire other parents to file suit to recover for the extraordinary expenses that everyone encounters while raising a child.

Roe responds that she was not claiming the everyday support damages prohibited in *Poor* and *M.A.*, but rather the segregated costs C.E. uniquely will encounter as a result of her own disabilities. Roe notes that the jury was instructed that its economic loss award was limited to those costs that were "extraordinary due to C.E.'s disabilities," and should not include the "ordinary costs of raising a child." She further argues that the borough should not be allowed to avoid liability simply because C.E. reasonably decided not to abort her pregnancy or put her child up for adoption. She argues that because they will remain responsible for the substantial ordinary costs of raising a child, there is no risk that other developmentally disabled women will decide whether to keep and raise their children based on whether they might recover a similar award.

Under the circumstances of this case, we agree with the trial court and affirm this special damage award. This case is distinguishable from *Poor* and *M.A.* because C.E. sought only "extraordinary" damages, as opposed to ordinary expenses of raising the child. In *Poor* we considered a certified question from the United States District

---

**31.** 54 P.3d 271, 281 (Alaska 2002).

**32.** *Id.* at 281–82.

**33.** *See* Part III.C.

**34.** 791 P.2d 1005 (Alaska 1990).

**35.** 951 P.2d 851 (Alaska 1998).

Court about a mother's damages claims against her biofeedback therapist who tortiously impregnated her. We agreed with the decision of the California Court of Appeal in *Barbara A. v. John G.*,[36] and held that the mother could not recover damages for the cost of raising the child because the fact a tort caused the child's conception did not relieve the mother of her statutory duty to support her child.[37] We were concerned that permitting the damages the mother sought would reduce the parents' duty of support, and might harm a child who later learned of the circumstances of the award.[38]

In *M.A.* we applied similar reasoning and denied recovery of child-raising expenses to a minor mother whose doctor negligently failed to diagnose her pregnancy.[39] In that context we were also concerned that a contrary ruling would unduly affect the decisions of pregnant women about whether to have and raise their children.[40] We held that the mothers could recover the tort damages for proximately caused injuries but "[b]eyond that point, no compensation for expenses or other damages related to rearing a healthy child may be allowed." [41]

Here, Roe offered the testimony of a rehabilitation nurse and vocational specialist who presented a "life care plan" segregating the ordinary costs of raising M.E. from the unique costs C.E. would incur as a result of C.E.'s disabilities, including the cost of special parenting skills training and counseling for C.E. to deal with the stress of being a parent.

The policy considerations discussed in *Poor* and *M.A.* do not apply here. Developmentally disabled women are unlikely to make child-bearing and child-rearing decisions based on the possibility they may recover extraordinary costs should they file suit—especially because they will still be responsible for all ordinary child-rearing expenses. Moreover, recovery of extraordi-

nary damages in this situation is unlikely to cause C.E.'s child to suffer harm or feel unwanted. The sort of costs awarded here can be segregated and distinguished from the ordinary and unrecoverable costs, and there is little fear of the systemic cost-shifting the borough envisions. We accordingly hold that the trial court properly allowed the jury to award damages for C.E.'s extraordinary costs associated with raising M.E.

### F. The Trial Court Did Not Abuse Its Discretion by Admitting into Evidence One Page of a Deposition.

■■■■ The former director of the residential program, Kathleen Addison, testified telephonically at trial after the jury saw her video-taped deposition. When Addison testified at trial that she did not remember making a statement at her deposition, Roe attempted to impeach Addison with the deposition statement. Addison ultimately agreed that she must have made the statement. Roe moved into evidence the page of Addison's deposition containing the disputed statement. Over the borough's objection, the court received the single page of Addison's deposition into evidence and allowed the jury to consider it during its deliberations.

The borough argues on appeal that it was reversible error to admit the statement into evidence. It acknowledges that the trial court had discretion to admit prior inconsistent statements if the proper foundation was laid,[42] but argues that the court should not have admitted this page into evidence because the witness admitted making the prior statement. It argues that it was prejudiced because the deposition page allowed the jury to give undue weight to a mistake of a critical witness.

■■■■ We review a trial court's evidentiary

36. 145 Cal.App.3d 369, 193 Cal.Rptr. 422 (1983).

37. *Poor*, 791 P.2d at 1007 (citing AS 25.20.030).

38. *Id.* at 1007–08.

39. 951 P.2d at 855.

40. *Id.*

41. *Id.* at 856.

42. The borough cites Alaska Rule of Evidence 613(b) and *Nunn v. State*, 845 P.2d 435, 440 (Alaska App.1993).

rulings for abuse of discretion.[43] Admitting the page into evidence did not abuse the court's discretion. And the borough does not show that the page contained irrelevant or otherwise harmful material, or that its contents could have somehow unduly influenced the jury and prejudiced the borough. We discern no error.

## IV. CONCLUSION

We therefore AFFIRM the judgment.

BRYNER, Justice, not participating.

---

**43.** *Era Aviation, Inc. v. Lindfors,* 17 P.3d 40, 47 (Alaska 2000).