Lawrence A. PEDERSON and Paul J. Nangle, Appellants,

v.

Brienne BARNES and James A. Aiken, Appellees.

No. S–11621.

Supreme Court of Alaska.

July 21, 2006.

R.N. Sutliff, Anchorage, for Appellants.

Edmond W. Burke, Burke & Bauermeister, P.L.L.C., Anchorage, for Appellee Brienne Barnes.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

MATTHEWS, Justice.

## I. INTRODUCTION

This case presents two new questions of law. First, in which circumstances is a guardian's lawyer liable to the ward for the guardian's wrongdoing? We adopt the Restatement standard and conclude that liability exists only if the lawyer knew or had reason to know of the wrongdoing. Second, which liability regime applies in duty-to-protect cases? Based on the legislative history behind AS 09.17.900, we determine that pure several liability applies.

## II. FACTS AND PROCEEDINGS

### A. Facts

Brienne Barnes's parents died in Fairbanks on February 21, 1997, when her father killed her mother and then killed himself. Barnes was eleven years old at the time. James Aiken was Barnes's maternal uncle, and was the mother's only immediate adult relative. Aiken promptly traveled from San Francisco to Fairbanks and contacted Lawrence Pederson, an attorney in Anchorage, to represent him in his petition to become Barnes's guardian.

On February 28, 1997, a guardianship hearing was held in Fairbanks, presided over by Standing Master Alicemary Closuit, who approved Aiken's appointment as guardian. After his appointment, Aiken moved from San Francisco and lived in Fairbanks with Barnes. Approximately twenty-one months later, in November 1998, Barnes's therapist sent a letter to the court, which found its way to Pederson. In the letter, Barnes's therapist said that there were indications that Aiken was spending Barnes's money on himself—e.g., that Aiken was unemployed, that he had purchased a home in his name, and that he was buying expensive medicines for himself and his pets.

In response to this letter, Pederson spoke to Aiken, who assured him that Barnes's money had been invested with a San Francisco friend of Aiken's who was in the investment business. Aiken provided Pederson with financial statements, which are described below. Pederson had Aiken confirm that the investor friend was "a certified investment person" and "was licensed and bonded." However, Pederson never attempted to contact the investment company to verify that it existed and that it had Barnes's money. Pederson also spoke to Joyce Parks, a Fairbanks real estate agent who had become close to Aiken in the course of helping him find a house (and who eventually uncovered Aiken's fraud and then brought this lawsuit against both Aiken and Pederson). She told Pederson that the therapist was a "loose cannon" and was not to be trusted. It also appears that Pederson unsuccessfully attempted to talk to the therapist.

On December 9, 1998, Pederson filed a report with the court on Aiken's behalf, in which he attempted to refute the allegations made by the therapist. The report said that Aiken was receiving workers' compensation plus $800 a month in "what is effectively child support" and that Medicaid was paying his medication bills. The report also listed Barnes's assets and tried to match current assets up to the original sources of assets. According to the report, Barnes had assets of approximately $49,000, almost all of it invested in trust with "Heid Investment Company." The sources of these assets were: $33,000 in crime victim compensation and Public Employee Retirement System benefits accrued by Barnes's mother; two years' worth of permanent fund dividends for Barnes; and $1,070 per month paid to Barnes in social security benefits. Pederson stated in the report that the $49,000 total did not include a pending payment of $34,000 from the state Supplemental Benefits System (SBS).

Pederson attached to the report what appeared to be account statements from an entity called Heid Investment Company.

These reports showed two account statements on Heid letterhead, with address, telephone number, and "HIC" logo. One statement purported to be a "Transaction Report for Investment Account Number 57426113451 James A. Aiken in trust for Brienne Barnes." It showed "Deposits" of $34,251.71, "Losses" of $7,371.77, "Profits" of $17,472.53, and an "Account Total" of $44,352.47 as of November 15, 1998. The second statement was titled "Transaction Report for Money Market Account Number 57426113451 James A. Aiken in trust for Brienne Barnes." It showed "Deposits" on various dates totaling $3,051, "Interest to 11/15/98" of $381.37, and an "Account Total" of $3,432.37. As would be pointed out later, after Aiken's fraud was discovered, the money market account implied an incredibly high return for money market funds.

On December 10, 1998, Master Closuit held a hearing. The only people present were Aiken and Pederson (who appeared by telephone). Master Closuit seemed persuaded by the December 9 report, made Aiken affirm under oath that everything in it was true, and said she would recommend that Superior Court Judge Charles R. Pengilly approve the report and continue Aiken's guardianship.

A week later, before Master Closuit's recommendation was approved by the superior court, Pederson, on Aiken's behalf, filed a supplement to the report. The supplement explained that the December 9, 1998 report "inadvertently omitted one account," a certificate of deposit worth $40,274.18 held through Heid. With the CD, Barnes's assets totaled $89,167.53, as opposed to the $49,000 shown in the December 9 report. Attached to the supplement was the Heid account statement, which purported to show "Interest to 11/15/98" of $3,494.11 on the certificate of deposit. Again, the interest implies a remarkable return on a certificate of deposit of almost ten percent over a period of less than a year.

On Master Closuit's recommendation, and "based on the report, the supplement and Mr. Aiken's testimony," Judge Pengilly determined that the allegations in the therapist's letter were "groundless" and approved the continuation of the guardianship.

By the summer of 1999, Parks had apparently lost confidence in Aiken. She petitioned to become a guardian, and eventually became co-guardian with Aiken. In October 1999 she discovered that the Heid accounts did not exist and informed Pederson. Pederson then quickly discovered for himself that Heid Investment Company did not exist and that the phone number on the account statements was fictitious. He promptly informed the court. Aiken was eventually convicted of theft in the first degree, after it was discovered that the $111,000 in estate assets had been reduced to less than $200.

### B. Proceedings

Joyce Parks, as guardian for Barnes, filed a lawsuit against Aiken, Pederson, and Paul J. Nangle, another attorney associated with Pederson.[1] In the count directed at Pederson and Nangle, the complaint alleged that Pederson had a duty to Barnes "to use due care to determine and ensure that [her] assets were not placed in jeopardy," and that his violation of this duty constituted negligence and malpractice. Pederson and Nangle moved for summary judgment, in part based on Pederson's argument that he had not had actual knowledge of Aiken's wrongdoing, and that absent this knowledge he could not have breached any duty he might have owed to Barnes. Barnes opposed the motion with an affidavit from Bruce Gagnon, an Anchorage attorney, opining that Pederson knew or had "reason to know" of Aiken's fraud, based in part on the high returns shown in the Heid statements. The superior court denied Pederson's motion. Relying on *Fickett v. Superior Court of Pima County*,[2] the court held that Pederson could be liable if he "knew or should have known" of the

1. In December 2003 Barnes was substituted as the plaintiff for Parks. All references in this opinion to the plaintiff will use Barnes's name. Additionally, all references to the defendant or appellant will employ Pederson's name, even though Nangle was also sued and held jointly liable.

2. 27 Ariz.App. 793, 558 P.2d 988 (Ariz.App. 1976).

fraud. The superior court concluded that there was at least a question of fact as to whether Pederson knew or should have known of Aiken's fraud.

The case was then tried to a jury. At the close of Barnes's case, Pederson and Nangle moved for a directed verdict absolving them of liability for punitive damages; this motion was denied. They also moved for entry of judgment against Aiken in the approximate amount of $82,000, which was the amount Aiken had been ordered to pay as restitution in his criminal case. This motion was not opposed by Barnes and was granted by the court.

The jury returned a special verdict finding that on November 16, 1998 (the date the superior court (1) received the therapist's allegations that Aiken may have been stealing money and (2) ordered a hearing about the allegations), Pederson breached his duty of care. The jury awarded compensatory damages of $8,473.61—the amount of money found by the jury to have been stolen from Barnes after that date. The jury also found that Aiken was sixty percent at fault and that Pederson was forty percent at fault for the compensatory damages. Finally, the jury found that Pederson should be liable for $37,500 in punitive damages, and that Aiken should be liable for $75,000 in punitive damages. Pederson and Nangle moved for a JNOV, but this was denied.

Superior Court Judge Mark Wood then entered judgment on these verdicts. Judge Wood entered judgment against Pederson and Nangle jointly, holding them liable for the full $8,473.61 in economic loss that occurred after November 1998, notwithstanding the jury's allocation of sixty percent of the fault for that loss to Aiken. The court also entered judgment against them for the $37,500 in punitive damages awarded against Pederson by the jury.

## III. DISCUSSION

### A. Pederson's Motion for Summary Judgment.

■ In order to be liable to Barnes for damages she suffered as a result of Aiken's wrongdoing, Pederson must have breached a legal duty that he owed to Barnes.[3] When Pederson moved for summary judgment, he argued that he had no actual knowledge of Aiken's wrongdoing and that absent this knowledge he could not have breached any duty he might have owed to Barnes. The superior court concluded that "Pederson, in his representation of Aiken as Barnes' guardian, owed a legal duty of care to not adversely affect Barnes' interest in the guardianship estate." Moreover, the superior court determined that a question of material fact existed about "[w]hether Pederson knew or should have known that Aiken was mismanaging or wasting the guardianship estate." As a result, the superior court denied Pederson summary judgment.

■ "We review a superior court order denying summary judgment de novo."[4] "[I]f a genuine issue of material fact exists or the moving party was not entitled to judgment as a matter of law" we affirm the denial.[5] "A material issue of fact exists where reasonable jurors could disagree on the resolution of a factual issue. Facts are to be viewed in the light most favorable to the nonmoving party."[6]

■ In his appeal, Pederson argues that the superior court applied the wrong legal standard when determining the parameters of the legal duty he owed to Barnes. Pederson argues that the superior court, when considering Pederson's motion for summary judgment, should not have asked whether

3. *See Lyons v. Midnight Sun Transp. Servs., Inc.*, 928 P.2d 1202, 1204 (Alaska 1996) (enumerating the four components of a negligence claim: duty, breach of duty, causation, and harm).

4. *Ondrusek v. Murphy*, 120 P.3d 1053, 1055 (Alaska 2005). Barnes, like the appellee in *Ondrusek, id.* at 1056 n. 2, does not argue that the fact that the case was ultimately decided on the merits should prevent this court from consider-

ing the denial of the motion for summary judgment. Since the point was not raised, we will postpone consideration of this issue until a later case. *Id.*

5. *Id.* at 1055.

6. *Id.* at 1055–56 (citations and quotation marks omitted).

Pederson "knew or should have known" of Aiken's misconduct, but should instead have applied the Restatement[7] standard and asked just whether Pederson "knew" of the wrongdoing. Because it is undisputed that Pederson had no actual knowledge of Aiken's wrongdoing, Pederson contends that if the superior court had applied the correct legal standard, it could not have found a question of material fact to exist about whether Pederson had violated his duty to Barnes. As a result, the superior court would have had no choice but to grant summary judgment to Pederson.

We agree with Pederson that section 51 of the Restatement (Third) of the Law Governing Lawyers articulates the correct standard for determining the circumstances in which a guardian's lawyer owes a duty to the guardian's ward. Section 51 explains that

a lawyer owes a duty to use care . . .

. . .

(4) to a nonclient when and to the extent that:

(a) the lawyer's client is a . . . guardian[;]

(b) the lawyer knows that appropriate action by the lawyer is necessary with respect to a matter within the scope of the representation to prevent or rectify the breach of a fiduciary duty owed by the client to the nonclient, where (i) the breach is a crime or fraud or (ii) the lawyer has assisted or is assisting the breach;

(c) the nonclient is not reasonably able to protect its rights; and

(d) such a duty would not significantly impair the performance of the lawyer's obligations to the client.[8]

Pederson's argument that he owed no duty to Barnes under Restatement (Third) of the Law Governing Lawyers section 51(4) derives from his belief that he had insufficient knowledge of Aiken's wrongdoing. Knowledge is a requirement of section 51(4)(b). However, since Pederson argues that an application of the Restatement standard compels an award of summary judgment in his favor, it behooves us to assess all of the elements of section 51(4), not just section 51(4)(b). If the facts of the case fail to satisfy any one of the elements of section 51(4), Pederson would have no legal duty to Barnes and could not be held liable for damages.

Beginning our analysis with section 51(4)(a), neither side contests the fact that Pederson's client, Aiken, was Barnes's guardian. It is also undisputed not only that Aiken committed a crime when he stole his niece's money, as evidenced by his criminal conviction, but also that his crime was facilitated by the report that Pederson drafted and submitted to the superior court refuting allegations of Aiken's wrongdoing. As for section 51(4)(c), according to the terms of the Restatement, Barnes, a minor at the time that her uncle stole her money, was not reasonably able to protect her rights.[9] Finally, while neither side addresses the issue, section 51(4)(d) is also satisfied, since it does not appear that Pederson would have violated his obligations to Aiken had he taken the action he ultimately took—reporting Aiken's wrongdoing to the court—sooner.[10]

Since all of the other requirements of Restatement section 51(4) are satisfied, in order to assess whether Pederson owed a duty to Barnes, all that remains to be determined is whether Pederson "knew" that he needed to take action to "rectify" Aiken's wrongdoing. The Restatement defines "know" as having actual knowledge or, alternatively, "reason to

---

7. Restatement (Third) of the Law Governing Lawyers § 51 (2000).

8. *Id.* at § 51(4).

9. *Id.* at § 51 cmt. h (explaining that a nonclient beneficiary is unable to protect her rights when she is too young to manage her own affairs).

10. *See* Alaska Rule of Professional Conduct 1.6(b)(1), which permits lawyers to disclose confidential client information when the lawyer be-

lieves that the disclosure is reasonably necessary to prevent a crime by client that is likely to result in substantial injury to the property of another; *see also* the comment to Alaska Rule of Professional Conduct 1.14 (stating that if a guardian's lawyer "is aware that the guardian is acting adversely to the ward's interest, the lawyer may have an obligation to prevent or rectify the guardian's misconduct.").

know," which is further defined as having "information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists."[11] The Restatement takes care to distinguish "reason to know" from "should know."[12] "Should know" "denote[s] the fact that a person of reasonable prudence and intelligence or of the superior intelligence of the actor would ascertain the fact in question in the performance of his duty to another, or would govern his conduct upon the assumption that such fact exists."[13] "Reason to know" is a less onerous standard than "should know," because "reason to know" only involves drawing inferences from known facts, whereas "should know" entails a duty to inquire and determine new facts.[14]

Pederson reiterates several times in his briefs that he had no actual knowledge of Aiken's wrongdoing. At no point does he address whether he had reason to know of Aiken's conduct. Instead, Pederson analogizes his situation to that of the lawyer in Illustration 6 to Restatement (Third) of the Law Governing Lawyers section 51. In Illustration 6, a lawyer represents a client in the client's capacity as a trustee. The client tells the lawyer that he is going to transfer trust funds into a trust account, but what the client is actually planning to do is embezzle the funds by transferring them into his own account. According to the illustration:

> [e]ven though [L]awyer could have exercised diligence and thereby discovered [Client's description of his plan] to be false, Lawyer does not do so. Lawyer is not liable to the harmed Beneficiary. Lawyer did not owe Beneficiary a duty to use care because Lawyer did not know (although further investigation would have revealed) that appropriate action was necessary to prevent a breach of fiduciary duty by Client.

The facts of this case differ from the facts in Illustration 6, however. The only information known by the lawyer in the illustration is that the client planned to transfer trust funds into a trust account. There is nothing at all suspicious about such a course of action, so the lawyer in the illustration has no information from which to draw an inference that the client is planning to embezzle funds. In this case, by contrast, several warning signs of Aiken's misconduct existed. Pederson knew about Barnes's therapist's allegations that Aiken was living beyond his means. Moreover, Pederson had obtained from Aiken three financial statements purportedly issued by Heid Investment Company. When opposing Pederson's motion for summary judgment, Barnes submitted a summary of Attorney Bruce Gagnon's testimony. In the summary, Gagnon opined that a number of characteristics of the Heid Investment Company reports gave "Pederson reason to know that something was amiss with Aiken's handling of guardianship funds." According to Gagnon, not only do the reports purport to come from an obscure financial institution and suspiciously provide no details about how Barnes's assets were being invested, but they also indicate impossibly high rates of return on the investments. Moreover, Aiken, in his initial accounting to Pederson, failed to account for $40,274.18, which, when reported, almost doubled the amount of guardianship funds.

Given this evidence about the suspicious appearance of the account statements, the incredibly high levels of return on the investments, and the fact that for a time Aiken apparently forgot about half of the guardianship funds, we hold that a genuine issue of material fact existed about whether Pederson had enough information from which to infer, and thus had "reason to know," that Aiken was defrauding his niece. When assessing Pederson's argument at the summary judgment stage that he could not have breached a duty to Barnes, the superior court should have asked whether Pederson had "reason to know," not whether he "should have known," of Aiken's misconduct. Although the superior court applied an erroneous standard, the

---

11. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 51 cmt. h (internal quotations omitted).

12. *Id.*

13. RESTATEMENT (SECOND) OF TORTS § 12 (1965).

14. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 51 cmt. h.

superior court nevertheless reached the correct result. We therefore uphold the denial of Pederson's motion for summary judgment.[15]

### B. Pederson's Liability for the Compensatory Damage Award.

■ The jury in this case found Aiken sixty percent at fault and Pederson forty percent at fault for the portion of Barnes's loss ($8,473.61) that occurred after Pederson breached his duty to her. The court, when entering final judgment against Pederson, ordered Pederson to pay the entire $8,473.61 amount. Pederson argues that the superior court erred when it held him jointly and severally liable with Aiken rather than apportioning the damages between them according to their percentage of fault.

■ Analysis of Pederson's liability for compensatory damages requires interpretation of AS 09.17.080 and 09.17.900. Because

statutory interpretation poses a question of law, this court uses its independent judgment[16] and adopts "the rule of law that is most persuasive in light of precedent, reason, and policy."[17] When interpreting a statute, the court "looks to three factors: the language of the statute, the legislative history, and the legislative purpose behind the statute."[18]

When the jurors in this case allocated fault between Aiken and Pederson, they acted in conformity with AS 09.17.080(a)(2), which requires the trier of fact to indicate "the percentage of total fault that is allocated" to each defendant (as well as to others defined in subsection.080(a)). Subsection.080(d) requires the superior court to "enter judgment against each party liable on the basis of several liability in accordance with that party's percentage of fault."[19]

In 1997 the legislature amended the definition of fault found in AS 09.17.900 to include

---

15. Pederson also complains about the court's instruction to the jury explaining the duty of care to a non-client but for some unexplained reason makes explicit his decision not to appeal this issue. As a result, we will not address the court's inclusion of a duty to investigate into the "know" or "reason to know" standard used in the jury instruction.

16. *Odum v. Univ. of Alaska, Anchorage,* 845 P.2d 432, 434 (Alaska 1993).

17. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

18. *Western Star Trucks, Inc. v. Big Iron Equip. Serv., Inc.,* 101 P.3d 1047, 1050 (Alaska 2004).

19. AS 09.17.080 reads in full:
    (a) In all actions involving fault of more than one person, including third-party defendants and persons who have settled or otherwise been released, the court, unless otherwise agreed by all parties, shall instruct the jury to answer special interrogatories or, if there is no jury, shall make findings, indicating
    (1) the amount of damages each claimant would be entitled to recover if contributory fault is disregarded; and
    (2) the percentage of the total fault that is allocated to each claimant, defendant, third-party defendant, person who has been released from liability, or other person responsible for the damages unless the person was identified as a potentially responsible person, the person is not a person protected from a civil action

under AS 09.10.055, and the parties had a sufficient opportunity to join that person in the action but chose not to; in this paragraph, "sufficient opportunity to join" means the person is
      (A) within the jurisdiction of the court;
      (B) not precluded from being joined by law or court rule; and
      (C) reasonably locatable.
    (b) In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each person at fault, and the extent of the causal relation between the conduct and the damages claimed.
    (c) The court shall determine the award of damages to each claimant in accordance with the findings and enter judgment against each party liable. The court also shall determine and state in the judgment each party's equitable share of the obligation to each claimant in accordance with the respective percentages of fault as determined under (a) of this section. Except as provided under AS 23.30.015(g), an assessment of a percentage of fault against a person who is not a party may only be used as a measure for accurately determining the percentages of fault of a named party. Assessment of a percentage of fault against a person who is not a party does not subject that person to civil liability in that action and may not be used as evidence of civil liability in another action.
    (d) The court shall enter judgment against each party liable on the basis of several liability in accordance with that party's percentage of fault.

intentional conduct.[20] With this amendment, the legislature made it clear that it intended AS 09.17.080's several liability regime to extend to cases involving intentional conduct.[21]

While the amended AS 09.17.900 and .080, when read together, clearly extend pure several liability to intentional torts, the statutes make no explicit mention of which type of liability applies in duty-to-protect cases. This court held in *Kodiak Island Borough v. Roe* that prior to 1997, torts stemming from a breach of the duty to protect were subject to joint and several liability, as described in the Restatement (Third) of Torts: Apportionment of Liability section 14.[22] While we declined to decide the issue in *Kodiak*, we suggested that the 1997 amendment might have "displaced the common law and that section .900 may now permit an apportionment that is contrary to Restatement (Third) of Torts: Apportionment of Liability section 14."[23]

Superior Court Judge John Reese grappled with the issue of liability in a duty-to-protect case, *Doe v. State of Alaska, Department of Corrections.*[24] In an order resolving motions for summary judgment and rule of law, Judge Reese decided that because "the legislature did not expressly consider tortfeasors in duty to protect cases," and because "including intentional acts in duty to protect cases undermines established policy in Alaska case law," AS 09.17.080 and .900 were ambiguous when applied to duty-to-protect cases.[25] Judge Reese concluded that because "the duty of care ... would effectively be

nullified if the party entrusted with the duty to protect was permitted to allocate, and effectively shift, the fault to the subsequent intentional tortfeasor," [26] if Doe proved that the state had violated its duty of care, then the state and the intentional tortfeasor would be jointly and severally liable.[27] The superior court in this case relied upon Judge Reese's decision in *Doe* when it declined to allocate fault between Aiken and Pederson.

Pederson argues that the superior court should not have relied upon Judge Reese's decision because he, unlike the state in the *Doe* case, had no duty to protect. We have already concluded that so long as he had reason to know of Aiken's "crime or fraud," [28] Pederson did have a duty to take appropriate action to prevent or rectify it,[29] a duty the jury found Pederson to have breached. We therefore conclude that Pederson is liable to Barnes "based on a failure to protect [her] from the specific risk of an intentional tort," [30] satisfying the Restatement's description of a duty to protect.

Pederson argues in the alternative that the pure several liability regime created by AS 09.17.080 and .900 extends to duty-to-protect cases. We agree with Pederson that as a result of the 1997 amendment to AS 09.17.900, duty-to-protect cases are now subject to the pure several liability regime of AS 09.17.080. While Judge Reese was correct that AS 09.17.900 does not specifically address duty-to-protect cases, the legislative history indicates that the legislature considered and intended to include duty-to-protect

---

**20.** After the amendment, AS 09.17.900 now reads in pertinent part: "In this chapter, 'fault' includes acts or omissions that are in any measure negligent, reckless, or intentional toward the person or property of the actor or others, or that subject a person to strict tort liability."

**21.** *Kodiak Island Borough v. Roe*, 63 P.3d 1009, 1014 (Alaska 2003).

**22.** *Id.* RESTATEMENT (THIRD) OF TORTS· APPORTIONMENT OF LIABILITY § 14 (2000) states:

A person who is liable to another based on a failure to protect the other from the specific risk of an intentional tort is jointly and severally liable for the share of comparative responsibility assigned to the intentional tortfeasor in addition to the share of comparative responsibility assigned to the person.

**23.** 63 P.3d at 1015.

**24.** No. 3AN–01–10389 CI (Alaska Super., Mar. 16, 2004).

**25.** *Id.* at 9.

**26.** *Id.*

**27.** *Id.* at 11.

**28.** RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 51(4)(b)(i).

**29.** *See supra* pages 557–559.

**30.** RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIABILITY § 14.

cases in its amendment of AS 09.17.900. When the Governor's Advisory Task Force on Civil Justice Reform proposed amending AS 09.17.900, it chose to illustrate the effect of the new language with an example of a duty-to-protect case:

> [P]laintiffs sometimes sue the State for negligent supervision of a probationer who intentionally shoots the plaintiff. The plaintiff may fail to name the probationer as a defendant and attempt to allocate all fault to the State. This amendment clarifies the State's right to name the probationer as a third-party defendant and to have fault allocated against him or her for his or her intentional acts. This avoids the incongruous result of allocating fault to those who are negligent, but not to those who act intentionally.[31]

When the task force's proposed amendment was presented to the legislature, the house majority leader's sectional summary stated that the amendment was "taken verbatim from the Report of the Governor's Task Force." [32]

Given the facts that the plain language of AS 09.17.900 makes no exception for the duty to protect, that the Governor's Advisory Task Force on Civil Justice Reform indicated that it intended the amended statute to reach duty-to-protect cases, and that the legislature incorporated by reference the task force's duty-to-protect example, we conclude that pure several liability applies in duty-to-protect cases. As a result, the superior court erred when it failed to apportion damages between Pederson and Aiken.

A determination that Pederson can only be held severally liable does not end our inquiry into the exact amount of Pederson's liability, however. Pederson argues that because Ai-

ken as part of his criminal conviction was ordered to pay Barnes restitution and because the superior court in the civil case issued a directed verdict against Aiken for the full amount of Barnes's loss, entering judgment against Pederson for any amount of Barnes's loss has the effect of holding him impermissibly jointly and severally liable with Aiken.

We need not resolve in this case whether the $82,000 judgment against Aiken for the full amount of Barnes's loss, which includes the $8,473.61 that was due in part to Pederson's breach of duty, could result in an offset that would be to Pederson's benefit.[33] For resolution of this issue to be required, Aiken would need to have paid a sum which, taken together with Pederson's liability, would result in Barnes receiving a partial double recovery.[34] Since Aiken had only paid $2,640 of the judgment against him as of July 2004, the most recent figure available in the record, it appears that this triggering event has not taken place.

Pederson also might be arguing that the superior court, when it granted the directed verdict for the full loss against Aiken, impliedly held that Pederson was innocent of wrongdoing. Since the superior court (1) believed that joint rather than several liability applied to the case; (2) submitted the issue of Pederson's fault to the jury; and (3) entered judgment against Pederson, the superior court clearly did not intend for its judgment against Aiken to indicate that Pederson had done no wrong.

Because we conclude that Pederson is severally liable for the forty percent of fault allocated to him by the jury, we vacate the superior court's entry of judgment against Pederson and remand so that the court can

---

**31.** *Report of the Governor's Advisory Task Force on Civil Justice Reform* 51 (1996).

**32.** House Majority Leader Brian S. Porter, *Sectional Summary of Senate CS for CS for SS for HM 58(RLS) am S: An Act Relating to Civil Actions* § 14 (Apr. 20, 1997).

**33.** The issue of the availability of an offset is pending before this court in *Diggins v. Jackson*, Supreme Court No. S–11141, and as to an earlier tort reform regime, in *Petrolane v. Robles*, Supreme Court No. S–11042.

**34.** *See Luth v. Rogers & Babler Constr. Co.*, 507 P.2d 761, 766–67 (Alaska 1973) (reaching the issue of offset in a pre-tort reform context, but only after the plaintiffs had received a $3,500 payment from people they could have joined as defendants. Because the $3,500 payment amounted to half of the jury-returned damage verdict, the plaintiffs would have received a partial double recovery had the offset not been permitted).

enter judgment in the amount of forty percent of the loss Barnes incurred after Pederson breached his duty to her.

### C. Pederson's Motion for a Directed Verdict on the Issue of Punitive Damages.

■ At the close of Barnes's case, Pederson moved for a directed verdict on the issue of punitive damages. The superior court denied the motion in part and permitted the jury to determine whether Pederson was liable for punitive damages after November 12, 1998.[35] The jury subsequently awarded Barnes $37,500 in punitive damages against Pederson, an amount which the court included in its final judgment. Pederson argues that because there was no clear and convincing evidence that his conduct was reckless rather than negligent, the court should have granted his motion for a directed verdict instead of presenting the issue of punitive damages to the jury.[36]

■ We review the decision to submit a punitive damages determination to the jury for abuse of discretion.[37] More generally, when reviewing a superior court's decision to deny a motion for a directed verdict, "we will 'determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable [persons] could not differ in their judgment.' "[38]

In order for a jury to make an award of punitive damages, AS 09.17.020(b) requires there to be clear and convincing evidence of either outrageousness, which includes acts done with malice or bad motives,[39] or "reckless indifference to the interest of another person." [40] At trial, Barnes stipulated that

Pederson did not have malice, and the superior court concluded that there was no evidence that Pederson "had any ill or hostile or bad motives." We therefore need to determine whether Pederson was recklessly indifferent to Barnes's interests.

A review of the record leads us to conclude that there is no evidence that Pederson acted with reckless indifference to Barnes's rights. Viewing the evidence in the light most favorable to Barnes, there is no indication that Pederson had actual knowledge of Aiken's wrongdoing. Nor is there evidence that Pederson attempted to avoid knowledge of Aiken's misconduct. Instead, when Pederson first received the therapist's accusations, he conducted a partial investigation by discussing the accusations with both Aiken and Parks. He even tried to contact the therapist. Pederson did fail to appreciate the significance of certain warning signs of Aiken's misconduct, such as the high rates of return from the purported investments. Yet even Barnes's expert witness who testified that Pederson had committed malpractice never characterized Pederson's behavior as reckless. When Pederson did eventually learn of Aiken's misconduct, he promptly reported it to the court.

Barnes argues that Pederson was reckless when he failed to acquire and inspect a copy of the accounting that Aiken submitted to the court on March 31, 1998. Barnes further argues that Pederson was recklessly indifferent to her interests when he, in his report to the court, indicated that no SBS funds had been paid, even though at the time he wrote the report he had a document in his file indicating that the funds had been paid. Pederson testified that despite the document

---

**35.** While the superior court initially authorized the jury to decide Barnes's claim for punitive damages resulting from Pederson's conduct after November 12, 1998, the special verdict form asked the jury to determine whether Pederson's conduct after November 16, 1998, was outrageous.

**36.** Pederson also argues that his motion for a directed verdict should have been granted because (1) Aiken's criminal conduct served as a superseding cause of Barnes's damages, and (2) Barnes failed to present any expert testimony that Pederson's conduct was reckless rather than merely negligent. Because we conclude that

there is no clear and convincing evidence that Pederson's conduct was reckless, we decline to address these additional arguments.

**37.** *Wal-Mart, Inc. v. Stewart*, 990 P.2d 626, 637 (Alaska 1999).

**38.** *Id.* at 632 (quoting *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 220 (Alaska 1978) (alteration in original)).

**39.** AS 09.17.020(b)(1).

**40.** AS 09.17.020(b)(2).

in his file, he did not believe that Barnes had received the SBS funds. Aiken had explained to Pederson that the SBS check had not cleared and that he had chosen instead to defer the payment. According to the Restatement (Second) of Torts, "[p]unitive damages are not awarded for mere inadvertence, mistake, errors of judgment and the like, which constitute ordinary negligence [but are restricted to] conduct involving some element of outrage similar to that usually found in crime." [41] While in retrospect it appears foolish for Pederson to have believed Aiken and to have allowed Aiken to submit any documents to the court on his own, we cannot conclude that Pederson's actions contained the element of outrageousness or recklessness necessary to justify an award of punitive damages.

Given the absence of evidence that Pederson acted with reckless indifference to Barnes's interests, we conclude that the denial of Pederson's motion for a directed verdict on the issue of punitive damages was an abuse of discretion.

### D. The Date on Which Prejudgment Interest Should Have Begun To Accrue.

Alaska Statute 09.30.070(b) provides that, barring exceptions not applicable in this case,

> prejudgment interest accrues from the day process is served on the defendant or the day the defendant received written notification that an injury has occurred and that a claim may be brought against the defendant for that injury, whichever is earlier. The written notification must be of a nature that would lead a prudent person to believe that a claim will be made against the person receiving the notification, for personal injury, death, or damage to property.

Pederson argues that rather than calculating prejudgment interest from October 27, 1999, the date that Pederson became aware of Aiken's wrongdoing and informed the

court, the court should instead have deemed interest to accrue from August 16, 2001, the date that Barnes's attorney wrote a demand letter to Pederson. According to Pederson, the August 16, 2001 letter was the first written notice he received that Barnes would pursue a claim against him.

The determination of when prejudgment interest begins to accrue presents a legal question that we review de novo. [42]

Alaska Statute 09.30.070(b) makes it clear that prejudgment interest begins to accrue on the date that the defendant learns that the plaintiff has a claim against him, rather than on the date the defendant learns that the plaintiff has suffered a loss. While Pederson learned on October 27, 1999, that Aiken had committed wrongdoing leading to Barnes's loss, it was not until August 16, 2001, when Pederson received Barnes's demand letter, that he learned that she would be pursuing a claim against him. We therefore reverse the superior court's choice of date for the accrual of prejudgment interest and remand for a calculation of prejudgment interest accruing from August 16, 2001.

## IV. CONCLUSION

For the above reasons we AFFIRM the superior court's denial of Pederson's motion for summary judgment. However, we VACATE the superior court's award of compensatory damages, REVERSE the superior court's denial of Pederson's motion for a directed verdict on the issue of punitive damages, and REVERSE the superior court's choice of date for the accrual of prejudgment interest. We REMAND the case so that the superior court can recalculate Pederson's share of compensatory damages and the amount he owes in prejudgment interest.

---

**41.** *State v. Hazelwood*, 946 P.2d 875, 889 (Alaska 1997) (Compton, C.J., dissenting) (quoting RESTATEMENT (SECOND) OF TORTS § 908 cmt. b) (alteration in original).

**42.** *Lloyd's & Inst. of London Underwriting Cos. v. Fulton*, 2 P.3d 1199, 1210 (Alaska 2000).