**ALPINE INDUSTRIES, INC., Appellant,**

v.

**Lori FEYK, Appellee.**

**No. S–9169.**

Supreme Court of Alaska.

May 11, 2001.

4. *See* Admin. Bulletin 65.

Eric J. Brown, Jermain, Dunnagan & Owens, P.C., Anchorage, for Appellant.

Gary M. Guarino, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

Alpine Industries, Inc. sued Dr. Lori Feyk, a public health official with the Alaska Department of Health and Social Services, for libel after she authored a public health bulletin critical of Alpine's air cleaning products. Because we conclude that absolute official immunity protects the authors of state public health bulletins, we affirm the superior court's grant of summary judgment for Dr. Feyk.

## II. FACTS AND PROCEEDINGS

A private citizen contacted the Alaska State Department of Health and Social Services (DHSS) in 1997 regarding the possible health effects of ozone-generating air cleaning devices. The Commissioner of Health

and Social Services referred the inquiry to Dr. John Middaugh, Chief of the Section of Epidemiology. Dr. Middaugh asked a DHSS public health specialist, Dr. Lori Feyk, to investigate the matter and report back to him.

Dr. Feyk researched the issue, speaking to health officials in other states, reading materials produced by the Environmental Protection Agency, and reviewing other scientific reports from private and public sources. Dr. Feyk met with Dr. Middaugh to present her conclusions; after considering her recommendations, Dr. Middaugh asked Dr. Feyk to prepare a public health bulletin to be issued by DHSS. Dr. Feyk drafted the public health bulletin based on the reports she had gathered. Dr. Middaugh made a few minor changes and authorized the bulletin's release to the public; it was published at his direction on September 8, 1997.

The bulletin, titled "Ozone Generators— Warning—Not For Occupied Spaces," stated that ozone "is a potent lung irritant that can cause respiratory distress, and levels of ozone that clean air effectively are unsafe to human health." The bulletin continued: "The Alaska Division of Public Health is warning Alaskans not to use ozone generating devices in occupied spaces such as vehicles or residential homes." The bulletin cited studies or reports from the U.S. Food & Drug Administration, the Environmental Protection Agency, the American Lung Association, Consumer Reports, and a private journal. It also stated that the State of Minnesota had prevailed in a lawsuit against "Alpine Air Products, Inc.," and that a Minnesota court had "found that the company had violated Minnesota consumer fraud and antitrust laws by making false and misleading claims about the efficacy and safety of ozone-generating Alpine purifiers."

Alpine Industries, Inc. (Alpine) manufactures ozone-generating air cleaning devices and sells them in Alaska through independent resellers. When Alpine learned of the public health bulletin, its president wrote the DHSS commissioner complaining that the bulletin was "false and misleading" and requesting a retraction. On September 19, 1997, an attorney for Alpine wrote an eleven-page letter to Dr. Feyk detailing alleged scientific and legal inaccuracies in the bulletin. Neither the commissioner nor Dr. Feyk responded to the two letters.

On October 1, 1997, Alpine sued Dr. Feyk for libel, tortious interference with business relationships, and unfair trade practices. On October 29, 1998, Dr. Feyk moved for summary judgment on the libel claim, and on November 2, she moved for summary judgment on the legal question of whether she was protected by "official immunity." The superior court granted both motions in May 1999. Alpine appeals both grants of summary judgment, as well as the superior court's award of attorney's fees to the state, which had incurred expense defending Dr. Feyk.

## III. *DISCUSSION*

### A. *Standard of Review*

We review a grant of summary judgment de novo, viewing the facts "in the light most favorable to the losing party."[1] A superior court's award of attorney's fees is reviewed under the abuse of discretion standard.[2]

### B. *Official Immunity*

"Under Alaska law, public officials in the executive departments of government have either absolute or qualified immunity from tort suits for discretionary acts committed within the scope of their authority."[3] In *Aspen Exploration v. Sheffield,*[4] we announced a three-step process for determining the existence and scope of official immunity. First, does the doctrine of official immunity apply to the state official's conduct?[5] Second, if it does apply, is the immunity absolute

1. *Thoma v. Hickel,* 947 P.2d 816, 818 (Alaska 1997).

2. *See Mount Juneau Enter., Inc. v. Juneau Empire,* 891 P.2d 829, 834 (Alaska 1995).

3. *Thoma,* 947 P.2d at 818.

4. 739 P.2d 150 (Alaska 1987).

5. *See id.* at 154.

or qualified?[6] And third, if it is only a qualified immunity, did the state official act corruptly, maliciously, or in bad faith?[7]

### 1. *Official immunity applies to Dr. Feyk's speech.*

We have held that official immunity applies to an official's conduct if (1) it is within the scope of the official's authority, and (2) it is a discretionary act.[8] Alpine does not argue that Dr. Feyk acted outside the scope of her authority by drafting the bulletin, but it does dispute whether her act was discretionary. Alpine argues that Dr. Feyk's research and drafting of the public health bulletin was a purely "ministerial" act, and therefore not entitled to any immunity.

██ Alpine relies on *Urethane Specialties, Inc. v. City of Valdez*,[9] where we applied a "planning-operational test" to determine whether a state function was discretionary or ministerial for sovereign immunity purposes.[10] Under that test, the state's broad policy decisionmaking may be protected, while the actual implementation may not be.[11] But we explained in *Aspen* that in the official immunity context, we adhere to the definition of discretionary acts expressed in *State v. Haley*.[12] We held in *Haley* that for the purposes of official immunity, " '[d]iscretionary' acts are those requiring 'personal deliberation, decision and judgment.' "[13]

Although Alpine strives to paint Dr. Feyk's conduct as something less than discretionary, the record is clear that she performed the research and provided the analysis that formed the basis of the bulletin. Her supervisor made only a few changes to the bulletin before deciding to publish it; the content was first and foremost Dr. Feyk's.

The process of researching and drafting such a bulletin certainly requires "deliberation, decision and judgment."[14] The mere fact that Dr. Feyk performed these discretionary functions at the direction of her supervisor does not change their intrinsic nature.

Because Dr. Feyk acted within the scope of her authority when she performed these discretionary acts, the doctrine of official immunity applies to Dr. Feyk's speech.

### 2. *Dr. Feyk's immunity is absolute.*

██ We now consider whether Dr. Feyk's official immunity should be absolute or qualified. The superior court concluded that Dr. Feyk's speech was protected by absolute official immunity. If the immunity is absolute, the inquiry ends; if it is only qualified, "inquiry into motive becomes relevant."[15] We explained in *Aspen* that three factors were relevant when deciding whether absolute or qualified immunity should apply:

(1) The nature and importance of the function that the officer performed to the administration of government (i.e.[,] the importance to the public that this function be performed; that it be performed correctly; that it be performed according to the best judgment of the officer unimpaired by extraneous matters);

(2) The likelihood that the officer will be subjected to frequent accusations of wrongful motives and how easily the officer can defend against these allegations; and

(3) The availability to the injured party of other remedies or other forms of relief (i.e.[,] whether the injured party can obtain some other kind of judicial review of the

---

6. *See id.*

7. *See id.* at 158, 160.

8. *See id.* at 154–56.

9. 620 P.2d 683 (Alaska 1980), *declined to follow by Taranto v. North Slope Borough*, 992 P.2d 1111, 1114–16 (Alaska 1999).

10. *See Urethane Specialities*, 620 P.2d at 688.

11. *See id.*

12. 687 P.2d 305 (Alaska 1984), *cited in Aspen*, 739 P.2d at 155.

13. *Haley*, 687 P.2d at 316 (quoting William Prosser, *Handbook of the Law of Torts* § 132, at 988–89 (4th ed.1971)), *quoted in Aspen*, 739 P.2d at 155.

14. *Haley*, 687 P.2d at 316 (quoting Prosser, *supra* note 13).

15. *Aspen*, 739 P.2d at 160.

correctness or validity of the officer's action).[16]

We conclude that the first two factors weigh heavily in favor of recognizing an absolute official immunity for Dr. Feyk's speech.

The first *Aspen* factor is present. Timely issuance of public health bulletins is of great public importance. It is likewise important that this function be performed correctly, according to the officer's best judgment, unimpaired by threats of a damage lawsuit against the individual officer. Denying absolute immunity to public health officials who issue warnings could discourage them from executing their jobs faithfully, diligently, and accurately, and could hinder proper performance of important government functions.

The second *Aspen* factor is also present. Product manufacturers and sellers potentially have strong incentives to file damage lawsuits against individual officers to rebut public health bulletins adverse to their products and to seek compensation for harm caused by publication. We assume that they may have legitimate complaints about a bulletin's accuracy. And some bulletins might be indefensibly defamatory had they been uttered by private persons. But regardless of the validity of such lawsuits, less-than-absolute immunity would increase their frequency. Defending against them would implicate the official's reasoning and good faith and would require strenuous and time-consuming defense efforts. Such efforts would inevitably divert attention from important official duties.

We are not ruling on the accuracy of Dr. Feyk's bulletin, although we note that Alpine submitted a substantial collection of scientific literature to rebut its substance. This simply illustrates that challenges to public health bulletins may entail significant scientific disputes. Because a bulletin's gross misrepresentation of the relevant scientific evidence may suggest the author's bad faith,[17] permitting such a challenge in context of a libel suit would require a jury to weigh disputed scientific evidence. The resulting litigation would be complex and would burden the defendant official and any employer defending the official. This would not be in the public interest.[18]

In many such cases the governmental employer will agree to defend and indemnify the official who is sued individually. But those agreements may be qualified by reservations, creating anxiety and conflicting litigation aims, especially if the suit alleges *ultra vires* intentions or seeks exemplary damages. Even if the public employer is defending the officer, such claims may justify retention of private counsel and cause personal stress. The threat of accusations against individual officers could therefore discourage all but the most courageous officials. In the field of public health, publication should not depend on the fortitude of individual officials.

Finally, frivolous accusations may be filed in a harassing effort to pressure the author to recant and to deter others from publishing similar warnings. Absent absolute immunity, significant disruption would be likely before a court or jury could reject such accusations for lack of merit or upon successful assertion of a qualified immunity defense. Absolute immunity forecloses this threat.

The third *Aspen* factor—whether plaintiffs such as Alpine have alternative remedies when they are harmed by a public health official's allegedly defamatory speech—is problematic.

■ Alpine argues that giving Dr. Feyk absolute immunity will leave it without a remedy. The attorney general, in behalf of Dr. Feyk, does not claim that Alpine had any alternative judicial or judicially appealable administrative remedy, but argues that Alpine has the alternative remedy of engaging in counter-speech and publishing opinions and information favorable to the safety and effectiveness of its ozone devices. The attorney general contends that the proper forum for scientific and public health disputes "is

16. *Id.* at 159–60.

17. *See Moffatt v. Brown,* 751 P.2d 939, 946 (Alaska 1988).

18. *See Aspen,* 739 P.2d at 161 (recognizing only qualified immunity for governor's alleged defamation in part because trial proceedings would not be "excessively complex or lengthy").

the arena of scientific and industry research and public debate and opinion."[19]

The remedy Dr. Feyk identifies—counter-speech—is not the kind of remedy contemplated in *Aspen*. DHSS is not simply another voice: it speaks in the public interest, backed by the authority of the state, and its warnings receive a strong presumption of objectivity. Forcing Alpine to compete with the state's public health pronouncement in the marketplace of ideas is not the kind of remedy that satisfies the third *Aspen* factor. *Aspen* stated that courts should consider "whether the injured party can obtain some other kind of *judicial review* of the correctness or validity of the officer's action."[20] An opportunity to engage in public debate was not the sort of remedy *Aspen* intended.

Because the attorney general has not identified any other possible remedies, we are not willing to decide sua sponte whether Alpine might have any effective judicial or judicially appealable administrative opportunities to respond to the bulletin or force its retraction.[21] We therefore assume here that the third *Aspen* factor is not satisfied. Nonetheless, the first two *Aspen* factors weigh so heavily in favor of absolute immunity in this case that the assumed absence of the third factor is not consequential.

█ Dr. Feyk is therefore entitled to absolute immunity for her allegedly defamatory speech. As the author of a public health bulletin, Dr. Feyk was performing an important governmental function. If immunity were only qualified, it would invite damage lawsuits that would hinder this function. The absence of any identified alternative avenues for relief does not change our conclusion. This absolute immunity protects all public officials who, in the course of performing discretionary government functions within the scope of their authority, speak on matters of health and public safety.

### C. *Attorney's Fees*

█ Alpine contends that because Dr. Feyk did not move for summary judgment until thirteen months after Alpine filed its lawsuit, the superior court abused its discretion by awarding Rule 82 attorney's fees against Alpine. It argues that Dr. Feyk's delay in moving for relief wasted attorney time and costs. Dr. Feyk quite reasonably responds that the delay was caused by discovery, especially the review of the scientific evidence presented by Alpine. Alpine has offered no persuasive reasons justifying a conclusion to cause us to think that the superior court abused its discretion in awarding attorney's fees against Alpine.

### IV. *CONCLUSION*

The superior court's grant of summary judgment and its award of attorney's fees are AFFIRMED.

FABE, Justice, not participating.

---

**19.** Alpine also asserts that the superior court acknowledged that Alpine had no other remedy available. Actually, it is doubtful that the superior court ruled that there was no alternative remedy. The court stated that Alpine has full access "to the arena of public opinion," and that "the other remedies ... leg is also met." This indicates that the court had actually agreed with the attorney general's argument, made on behalf of Dr. Feyk, that counter-speech is an effective alternative remedy.

**20.** *Aspen*, 739 P.2d at 160 (emphasis added).

**21.** Although we are not asked to decide on appeal whether Alpine could have, by supplying relevant information, persuaded DHSS to qualify or retract the bulletin, we do note that Alpine sued Dr. Feyk only twelve days after its attorney wrote a letter of protest to her. Perhaps because of this relatively short interlude before Alpine filed suit, the record does not indicate whether DHSS would have responded substantively to Alpine's protests, absent the lawsuit against its employee. We do not assume that DHSS would altogether fail to consider a manufacturer's retraction request supported by creditable data if given a fair opportunity to evaluate the evidence.